1  Devin A. McRae, State Bar Number 223239
    *dmcrae@earlysullivan.com*
2  Lisa L. Boswell, State Bar Number 190304
    *lboswell@earlysullivan.com*
3  Rebecca L. Claudat, State Bar Number 315736
    *rclaudat@earlysullivan.com*
4  EARLY SULLIVAN WRIGHT
    GIZER & McRAE LLP
5  6420 Wilshire Boulevard, 17th Floor
   Los Angeles, California 90048
6  Telephone:  (323) 301-4660
   Facsimile:  (323) 301-4676
7
   Attorneys for Plaintiffs
8  ROB GRABOW and PARADISE
   VALLEY PICTURES LLC
9

10                  UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

                        WESTERN DIVISION
12

13  ROB GRABOW, an individual;          Case No. 2:24-cv-09822-FLA-PDx
    PARADISE VALLEY PICTURES
14  LLC, a Montana limited liability    **DECLARATION OF PLAINTIFF**
    company,                            **ROB GRABOW IN SUPPORT OF**
15                                      **PLAINTIFFS ROB GRABOW AND**
                                        **PARADISE VALLEY PICTURES**
16           Plaintiffs,                **LLC'S OPPOSITION TO**
                                        **DEFENDANTS' MOTION FOR**
17       vs.                            **LEAVE TO FILE EARLY**
                                        **SUMMARY JUDGMENT MOTION**
18  NETFLIX, INC., a Delaware           **AND TO BIFURCATE DISCOVERY**
    corporation, LEBRON JAMES, an       **ON PRIOR INDEPENDENT**
19  individual; SPRINGHILL              **CREATION DEFENSE**
    ENTERTAINMENT LLC, a Delaware
20  limited liability company; CHERNIN  [*Opposition; and Declarations of David
    ENTERTAINMENT, LLC, a Delaware      R. Ginsburg and Devin A. McRae filed
21  limited liability company; WISE     and served concurrently herewith*]
    ENTERTAINMENT, INC. a California
22  corporation; LAKE ELLYN             Date:      April 4, 2025
    ENTERTAINMENT, INC., a California   Time:      1:30 p.m.
23  corporation; STERLIN HARJO, an      Crtrm.:    6B
    individual; SYDNEY FREELAND, an
24  individual; BRIT HENSEL, an         *Judge:  Fernando L. Aenlle-Rocha*
    individual; and DOES 1-20, inclusive,
25                                      Trial Date:       None Set
             Defendants.
26

27

28

5804580.4

**DECLARATION OF PLAINTIFF ROB GRABOW**

## DECLARATION OF ROB GRABOW

I, Rob Grabow, declare and state as follows:

1.      I am an individual party in the above-entitled action. I also formed co-Plaintiff Paradise Valley Pictures LLC, a film production company, and am its manager, member and owner. I make this declaration in support of Plaintiffs Rob Grabow and Paradise Valley Pictures LLC's ("Plaintiffs") Opposition to Defendants Netflix, Inc., Chernin Entertainment, LLC, Wise Entertainment, Inc., Lake Ellyn Entertainment, Inc., Springhill Entertainment LLC, LeBron James, Sterlin Harjo, and Sydney Freeland's (collectively, the "Netflix Defendants") Motion for Leave to File Early Summary Judgment Motion and to Bifurcate Discovery on Prior Independent Creation Defense (the "Motion") in the above captioned case. If called as a witness, I would and could testify to the matters contained herein.

### My Background

2.      I am a filmmaker, writer, actor, and producer from Montana. My previous writing credits include the 2023 feature film *The Year of the Dog* and a short film entitled *Method*. I wrote, directed, acted, produced, and largely financed *The Year of the Dog* which opened in about 100 commercial theaters across the country.

### My Original Work

3.      I am currently working on my second feature film, *The Gift of the Game*, which I wrote and am producing ("Original Work"). My script for the Original Work is registered with the US Copyright Office, registration numbers PAu 4-211-331 and Pau 4-246-704. I began writing the script for the Original Work in 2022.

4.      The Original Work is a powerful basketball film that deals with issues of community, race relations and poverty, and which centers around a Native American protagonist and his high school basketball team's quest to win the state championship. It is a poignant story about a mixed-race high school basketball team's push to make the state tournament, with much of the script's story coming from my own background including in acting and in basketball. It's a heartwarming journey of

**DECLARATION OF PLAINTIFF ROB GRABOW**

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1 community, finding purpose, making connections, overcoming grief and ultimately

2 healing. I grew up with a single mom in many culturally diverse areas across the

3 country, including Yup'ik and Athabascan communities. My script, the Original

4 Work, pulls heavily from my environment and life experiences. My hope for my script

5 was to contribute to an exploration of the gift of sport as a doorway to something

6 profound both within ourselves and in relationship to each other. This script and film

7 were a full-spirit, full-artistic, and full-financial investment for me.

8 **Access to My Original Work**

9     5.    Brit Hensel ("Hensel") is a cinematographer and director. She worked in

10 the camera department for the Emmy-nominated FX television series *Reservation*

11 *Dogs*. The series *Reservation Dogs* was co-written, executively produced, and

12 directed by Sterlin Harjo ("Harjo"). Hensel's sister, Taylor Hensel, is a director and

13 producer. She also worked in the camera department for *Reservation Dogs*. Based

14 upon information and belief, Hensel and Harjo were once in a romantic relationship

15 with one another and are also colleagues and collaborators who work together on

16 professional and personal endeavors.

17     6.    On or about May 14, 2024, I reached out to Hensel to introduce myself

18 and the Original Work. In my introductory email, I asked Hensel whether she would

19 be interested in learning more about the Original Work to see if she might like to join

20 the project as a director or director of photography. In her response, Hensel expressed

21 interest in being attached to the project. After exchanging a few emails and speaking

22 with one another in a Zoom meeting about the Original Work, on May 27, 2024, I

23 sent my copyrighted script of the Original Work to Hensel for her review and

24 comments. Hensel executed a Non-Disclosure Agreement in connection with her

25 review of the script for the Original Work. Hensel, by executing the NDA, agreed not

26 to divulge any information regarding the Original Work to any third person and agreed

27 not to copy any aspects of the Original Work. The script of the Original Work, which

28 I sent to Hensel for her notes, also conspicuously stated on each page that the work

5804580.4

2

**DECLARATION OF PLAINTIFF ROB GRABOW**

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

Docusign Envelope ID: E3426492-8FA0-4A68-A318-D0CC3E770032

1    was copyrighted.

2        7.    After reading the script, Hensel told me that she saw a great deal of

3    potential in the story, but that additional work on the script would be necessary for

4    her to attach herself to the project. She expressed her willingness to provide feedback

5    on the script if I was open to it.

6        8.    Hensel and I continued to exchange emails in which Hensel provided

7    comments about certain areas of the script that needed improvement. Hensel and I

8    also held Zoom meetings with one another to discuss the necessary revisions and areas

9    of improvement. At one point in our discussions, Hensel introduced me to her sister

10    Taylor, stating that Taylor was interested in producing the film. Upon the suggestion

11    of Hensel, I also sent the script to Taylor for review and notes.

12        9.    Throughout the exchange between Hensel and me, Hensel proceeded to

13    fish for information regarding the Original Work, including asking me about the

14    investors in the project, talent for the film, and the status of production. I also shared

15    with Hensel during these conversations my sources of inspiration for my film.

16        10.    After approximately three months passed since our first introduction to

17    one another, and after around three months of ongoing discussions about the Original

18    Work, Hensel sent me an email on or about August 8, 2024 stating that upon further

19    reflection the project was not aligning with her and her sister's professional interests

20    and as such they both were declining to move forward with me on my project.

21    **Rez Ball**

22        11.    Netflix released the film *Rez Ball* on September 27, 2024 (the "Infringing

23    Work"). I had only heard of *Rez Ball* peripherally through most of 2024 and it seemed

24    very different from my story. And I was also not aware that anyone I had contacted

25    regarding *The Gift of the Game* as potential cast and crew had any direct ties to *Rez*

26    *Ball*.

27        12.    Shortly before *Rez Ball* premiered on Netflix on September 27, 2024,

28    another consulting producer Dennis Aig from *The Gift of the Game* reached out to me

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  to let me know that he thought this new film called *Rez Ball* might have overlapping

2  elements with *The Gift of the Game*.

3     13.     By this point, I had become aware that several people I had been in touch

4  with regarding *The Gift of the Game* may have direct and active personal and

5  professional relationships to the defendants, including Hensel, who signed an NDA,

6  acknowledged reading *The Gift of the Game*, and was in a romantic relationship with

7  a *Rez Ball* writer Harjo. Even though these relationships and the connections to *Rez*

8  *Ball* were not disclosed to me, I figured and hoped, maybe naively, that if the

9  defendants were interested in taking content from my script, they would simply ask.

10     14.     Shortly after *Rez Ball*'s release, I skimmed the film focusing on the state

11  championship final game sequence - I was immensely proud of this part of my script

12  because I could not recall seeing it in the plethora of other basketball movies I had

13  watched. When I finally watched *Rez Ball*, my stomach sank. *Rez Ball*'s sequence

14  was virtually identical to what I had written. When I finally gathered the strength to

15  watch *Rez Ball* from beginning to end, it was a gut punch. The infringement seemed

16  beyond brazen.

17     15.     Not long afterward, I listened to *Canyon Dreams: A Basketball Season*

18  *on the Navajo Nation* by Michael Powell, the book that the defendants cite as

19  inspiration for *Rez Ball*. I was stunned to find that *Rez Ball* seemed to have more in

20  common with my script in terms of protected elements than it did with *Canyon*

21  *Dreams*. I also found very little overlap between *Canyon Dreams* and my script,

22  which strengthened my point of view that the defendants lifted material from my

23  script.

24     16.     I made a detailed comparison between *Rez Ball* and *The Gift of the Game*.

25  I noted over 200 overlapping elements -- sequences, characters, themes, pacing,

26  mood, setting, and even dialogue. These similarities were unexplainable to me as a

27  matter of 'chance', and it felt important to me to inquire further.

28

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

## Striking Similarities

17.    The abundant and striking similarities between my script and *Rez Ball* are outlined formally in the Complaint (ECF #1, ¶¶ 38-70). Below is the substance of a comparison I made early on of just three of the many strikingly similar scenes, which were also not present in *Canyon Dreams*.

18.    **Final State Tournament Sequence**: For the last play of the State Championship game, *Rez Ball* has the hero team down by one basket (just as in my script). Then, in *Rez Ball*, the hero player gets the ball at the end with a chance to win the game (just as in my script), and then the hero player shoots a last-second shot (just as in my script). In *Rez Ball*, the shot misses (just as in my script), so in *Rez Ball* it first appears as if the hero team has lost (just as in my script), and everyone is disappointed (just as in my script) – but wait, in *Rez Ball* (just as in my script), there is a late whistle by the referee (just as in my script): *Rez Ball*'s hero player is fouled (just as in my script) and now in *Rez Ball*, the hero player has a chance to shoot free throws to win the game (just as in my script), and *Rez Ball*'s hero player with these free throws now wins the game (just as in my script). It is worth noting that I found no such sequence in *Canyon* Dream, yet the timing, placement, structure, and sequencing of *Rez Ball* here was, from my point of view, inexplicably and substantively the same as my script.

19.    **Arrest Scene**: In *Rez Ball*, the hero player gets into a physical fight shortly before the state tournament (just as in my script), which leads to him being detained by police (just as in my script), then in *Rez Ball*, the hero team's coach picks up this hero player from police custody (just as in my script), then in *Rez Ball*, the hero team's coach drives the player from police custody to the hero player's home (just as in my script), the hero team's coach stops the car in front of the hero player's home and they have a key talk (just as in my script). The conceptual placement of this specific storyline just before the state tournament is nearly identical, the literal/timing placement of sequence is nearly identical – on page 88 of my script and 75 minutes

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  into the film – where each page is generally regarded as one minute of film time plus

2  or minus a small percentage, making even this timing significant. From my point of

3  view, this sequence was not just nearly identical in terms of the action of the scenes

4  and their relationships to each other, but also in the placement in the story just

5  preceding the state tournament and in the time on screen – the number of minutes into

6  the film where it occurs.

7       20.    I found no such sequences in *Canyon Dreams*. I did not find a scene or

8  scenes in *Canyon Dreams* containing (a) a physical fight involving the hero player,

9  (b) a police incident leading to the hero player's detainment, (c) the hero team's coach

10  picking up the star player from police custody, or (d) the hero team's coach driving

11  that star player home following police detainment. And I did not find a significant

12  talk that transpired during that drive home. I did not find any of these elements in

13  *Canyon Dreams*, – but they are in my script and *Rez Ball* in the same sequencing, in

14  roughly the same place in the story.

15       21.    **Local News Antagonist Team**: In my script, the antagonist team is

16  specifically introduced via a local news segment (as is in *Rez Ball*)). In my script,

17  during this local news segment, a member of the antagonist team is interviewed by a

18  local news reporter (just as later in *Rez Ball)*). In my script, this local news segment

19  takes place at the antagonist team's gym (as in *Rez Ball*). In my script, during this

20  local news story, the star of the antagonist player's team throws down specifically a

21  windmill dunk and hits a long three-pointer (as in *Rez Ball*). From my point of view,

22  the fact that this sequence from *Rez Ball* specifically included both the three-pointer

23  and the windmill dunk that I had scripted made it almost feel like a brazen copy of

24  my scene and sequence. Even more brazen, in both my script and *Rez Ball*, the hero

25  team's coach (a) watches this local news segment about the antagonist team (b) on a

26  TV (c) while sitting alone.

27       22.    It is important to note that I didn't find these scenes or sequences in

28  Canyon Dreams-*none of these scenes and certainly not these sequences existed in*

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1   *Canyon Dreams*, but they were in my script. And this whole sequence takes place in

2   a similar point in my script and in *Rez Ball*, both in terms of story and in terms of

3   minutes into the film: in my script, these sequences happen on about page 17, and in

4   *Rez Ball* they take place about 15 minutes into the film. It was hard for me to believe

5   that the same scenes and sequences would take place coincidentally at the nearly

6   identical place in the story.

7       23.    **Basketball Movies**: I am an avid fan of basketball movies. I could cite

8   50 (spanning almost 40 years) that do not have the same final state championship

9   sequence ending as my script. This means that, for the defendants' representations

10  just for that one scene to be true, we would have to have two nearly simultaneously

11  and completely independently created basketball films share a nearly identical,

12  significant, and specific final sequence at a very specific place in the story. And this

13  sequence would have to be something that has not occurred in any of these 50

14  basketball films. And this is just one of the many overlapping scenes, so every time

15  we add a new 'coincidental overlap,' the odds of all of them all being 'coincidence'

16  plummet. In addition, all of this 'chance' would have needed to happen in this context

17  in which one of the writers of the Infringing Work, Harjo, is or was in a romantic

18  relationship with another defendant, Hensel, who by her own admission received and

19  read the Original Work before *Rez Ball* was released. This was all just beyond

20  implausible to me.

21      24.    I was new to this kind of copyright situation and wrestled with myself

22  about how to proceed. I learned that there were multiple billionaires and billion-dollar

23  entities involved with *Rez Ball* – including Netflix with a market cap of around $500

24  billion -- as well as other highly influential people. That scared me on a number of

25  fronts including the risk to my future in filmmaking. And I loathed the idea of

26  potentially filing a claim again artists whose work I admired. I also felt that if I took

27  no action, there could be deleterious consequences for me personally and for *The Gift*

28  *of the Game*. I had no knowledge of copyright law and was concerned specifically

5804580.4

7

**DECLARATION OF PLAINTIFF ROB GRABOW**

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

Docusign Envelope ID: E3426492-8EA0-4A68-A318-D0CC3E770032

1 that Netflix or the other parties involved – if they were willing to steal from my script

2 and seemingly had so little regard for another artist's work –might have done this to

3 other creatives, and might also try to shut down my film – into which I had poured so

4 much of my heart and time -- and/or sue me and *The Gift of the Game* for copyright

5 infringement, given the overlapping elements between *Rez Ball* and *The Gift of the*

6 *Game*. I felt that I was left with no option other than to bring these claims against

7 defendants to protect my Original Work.

8     25.     After my lawsuit was filed, I was provided with a copy of an April 2023

9 production script for *Rez Ball* (the "Production Script") which I understand counsel

10 for the Netflix Defendants informally produced to my attorneys subject to my

11 agreement to maintain its confidentiality, which I of course did. I reviewed, analyzed

12 and compared the Production Script for *Rez Ball* with the *Rez Ball* film, and my script

13 for *The Gift of the Game* and identified numerous similarities between the *Rez Ball*

14 film and my script for *The Gift of the Game* which were not present in the Production

15 Script. I know from my own production experience that it would have been possible

16 and, in my opinion, fairly straightforward for the defendants to have implemented

17 elements and concepts from *The Gift of the Game* script into the *Rez Ball* film in the

18 post-production and editing process including but not limited to by way of automated

19 dialogue replacement, voiceovers, narration, radio programming, live game

20 announcements, and additional photography such as pickup shots and reshoots.

21     26.     The defendants seem to be trying to define the Infringing Work as the

22 Production Script. The Infringing Work, the subject of this case, is the version of *Rez*

23 *Ball* that aired on Netflix on September 27, 2024. It is not the Production Script. Based

24 upon information and belief, the Infringing Work was likely *not* created before

25 defendants had access to the Original Work, but discovery is needed to determine this

26 as a matter of fact. There are extraordinary, voluminous, and specific similarities in

27 protected elements between the Original Work and Infringing Work. The defendants

28 had abundant time in post-production to steal protected elements from the Original

EARLY SULLIVAN WRIGHT GIZER & McRAE LLP ATTORNEYS AT LAW

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1    Work and add them to the Infringing Work. And the way that many of the scenes cited

2    in the Complaint were cut, combined with the clear access to my script and the striking

3    similarities between the works, it was persuasive to me that was what happened.

4        27.    The defendants had access and a more-than-reasonable chance of

5    viewing the protected ideas, elements, and/or content of the Original Work. In her

6    Answer to the Complaint (ECF #40), Hensel has already admitted that:

7        •    She signed a nondisclosure agreement for the Original Work (¶ 23).

8        •    She read part of the script for the Original Work (¶ 23).

9        •    She was at one time in a romantic relationship with Harjo (¶ 22).

10        28.    In the Netflix Defendants' Answer to the Complaint (ECF #37), they

11    admitted that Harjo co-wrote *Rez Ball* (¶ 37).

12        29.  There are several initial problems with accepting at face value the Netflix

13    Defendants' representations about the content and date of the Production Script.

14        •    The Netflix Defendants presenting the Production Script are the same

15        defendants who are believed to have knowingly purloined copyrighted

16        material.

17        •    The single Production Script that the Netflix Defendants provided

18        seems to have come from an in-house server operated and controlled by the

19        Netflix Defendants with both sender and receiver appearing to have in-house

20        Netflix domains belonging to and under the control of the Netflix Defendants.

21        •    This Production Script was provided informally and does not include

22        any attestation regarding authenticity.

23        •    There has been no opportunity to cross-examine or otherwise

24        independently verify the content or date represented in the Production Script.

25        30.    In order to validate that the Production Script is in fact an authentic

26    version of the script as it existed in April 2023, I would need to conduct discovery

27    including but not limited to obtaining the subsequent versions of the script such as

28    the versions shared with the film editor and documents relating to the post-

5804580.4

9

**DECLARATION OF PLAINTIFF ROB GRABOW**

1  production and editing process (automated dialogue replacement, voiceovers,

2  narration, radio programming, live game announcements, and additional

3  photography, etc.) to determine which film elements existed as of April 2023 and

4  which ones were added thereafter.

5       31.     Even if the Netflix Defendants' representations about the Production

6  Script – which may or may not be true -- are to be believed, the Production Script

7  does not account for all overlapping, protected elements that exist between the

8  Original Work and Infringing Work.

9       32.     From my point of view, this lawsuit is vital to ensure I learn the truth

10  about how so much material from my script ended up in their finished *Rez Ball* film.

11  The defendants are more wealthy, more influential, more experienced and more

12  knowledgeable in these legal matters than I am -- there are huge power and

13  informational asymmetries. And given the way they seem to be intent on avoiding

14  any kind of discovery or finding of fact, it seems like they are hiding something and

15  at a minimum, without some finding of fact, it doesn't make sense to me to rule

16  anything out.

17       33.     For the above-mentioned reasons, I believe it is reasonable to have some

18  discovery of fact in order to determine why and how so much copyrighted material

19  from the Original Work ended up in the Infringing Work.

20       I declare under penalty of perjury under the laws of the United States of

21  America that the foregoing is true and correct. Executed on this 14th day of March,

22  2025, at Bozeman, Montana.

23


DocuSigned by:
Rob Grabow

24  _____
C94A7B13EE314BF...
Rob Grabow

25

26

27

28


EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

5804580.4

10

**DECLARATION OF PLAINTIFF ROB GRABOW**